DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Randy M. Gidley, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him R.C. 4123.57(B) compensation for the alleged loss of sight of the left eye, and to enter an order granting said compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court grant relator's request for a writ of mandamus. (Attached as Appendix A.) Relator, the commission, and respondent, Meijer, Inc. ("Meijer"), have filed objections to the magistrate's decision.
 {¶ 3} Meijer presents two objections. Meijer argues in its first objection that there was no evidence that relator's conversion disorder was permanent. Meijer maintains that Dr. Ronald Litvak's August 18, 2004 report speaks only to the permanency of the symptom of the conversion disorder and the permanency of the conversion disorder itself. However, Meijer's objection misses the magistrate's point. The magistrate did not make a final determination as to whether there was evidence that relator's conversion disorder or resulting vision loss were permanent. Rather, the magistrate's issuance of the writ was based upon the fact that the staff hearing officer ("SHO") failed to address whether Dr. Litvak's August 18, 2004 report rebutted the district hearing officer's ("DHO") finding that there was no evidence that relator's condition was permanent. Whether Dr. Litvak's August 18, 2004 report, in fact, provided sufficient evidence to demonstrate that relator's conversion disorder and resulting vision loss were permanent, which is the subject of Meijer's first objection herein, is for the commission to decide upon further review. Therefore, Meijer's first objection is without merit.
 {¶ 4} Meijer argues in its second objection that the magistrate erred in finding that Dr. Alan Letson's statement that hysterical blindness is often transient was not offered as a medical opinion specific to relator's condition at the time of relator's motion for compensation. Meijer contends this is a weight and credibility issue for the commission to determine. We disagree. Credibility involves whether the evidence is believable. Weight is a question of how much influence the evidence commands. The magistrate's findings in the present case with regard to Dr. Letson's statement did not address either weight or credibility. The magistrate did not question whether Dr. Letson's opinion about the transient nature of hysterical blindness was true or how much weight should be accorded such opinion. Instead, the magistrate simply found Dr. Letson was not referring to relator specifically in making the statement. As Dr. Letson's statement was not specifically referring to relator, there could be no relevancy to relator's request for R.C.4123.57(B) compensation, which was made over two years later. Under these circumstances, Dr. Letson's statement as to the transient nature of hysterical blindness cannot constitute "some evidence" to support the commission's order, and this objection is without merit.
 {¶ 5} The commission asserts three objections. In its first objection, the commission contends that the magistrate erred in finding that the SHO's order did not completely analyze the sufficiency of the evidence when it failed to mention Dr. Litvak's August 18, 2004 report. The commission maintains it is only required to state the evidence it relied upon, and, because Dr. Litvak's August 18, 2004 report was insufficient to answer whether relator's conversion disorder was permanent, it did not rely upon it and did not need to explain why it was rejecting the report. However, like Meijer's first objection above, the commission's objection misses the magistrate's point. The commission's argument depends upon a finding that Dr. Litvak's August 18, 2004 report was insufficient to prove relator's conversion disorder was permanent. Whether the report was sufficient to rebut the DHO's finding as to permanency is precisely the issue the magistrate ordered the commission to determine upon further review. As this issue was not determined by the magistrate and has yet to be determined by the commission, the commission's first objection must necessarily fail.
 {¶ 6} The commission argues in its second objection that the magistrate erred in finding that the SHO did not accept conversion disorder as an allowed condition. The commission points out that the first sentence of the SHO's order, in fact, acknowledges that conversion disorder was allowed. However, what the magistrate actually stated was that the commission's finding — that the loss of vision resulting from the allowed conversion disorder was not compensable under R.C. 4123.57(B) because there was no physical manifestation of the loss — was "in effect" a refusal to accept the conversion disorder as a claim allowance. The magistrate did not find that the commission actually refused to accept the conversion disorder as an allowed claim; rather, the magistrate meant that, because the vision loss was a result of the conversion disorder, any refusal to recognize the vision loss under R.C. 4123.57(B), was, in essence, a refusal to recognize the underlying conversion disorder. Therefore, the commission's objection is without merit.
 {¶ 7} The commission argues in its third objection that the magistrate erred when it concluded that the SHO made a finding that permanent loss of sight is not compensable if there is no physical manifestation of the loss. The commission claims the magistrate misinterpreted the SHO's finding in this respect and that the SHO meant the intent of R.C. 4123.57
is that claimants should not be entitled to separate scheduled loss awards under R.C. 4123.57(B) for symptoms of allowed psychiatric conditions. The commission asserts it would be more appropriate for a claimant to request compensation under R.C. 4123.57(A) rather than R.C.4123.57(B) when the claimant seeks to be compensated for a symptom of an allowed psychiatric condition that is not supported by objective medical evidence.
 {¶ 8} Although the precise meaning of the SHO's finding at issue is admittedly unclear, notwithstanding, we agree with the magistrate that nothing in R.C. 4123.57 suggests that a deficit produced by an allowed conversion disorder cannot be compensable under R.C. 4123.57(B). The commission cites no statute or case law to support its assertion that a request under R.C. 4123.57(A) is more appropriate when there exists a symptom caused by an allowed psychiatric condition. We concur with the magistrate that R.C. 4123.57, on its face, does not prevent a claimant from recovering for a loss under R.C. 4123.57(B), rather than R.C.4123.57(A), under these circumstances. With nothing to support its interpretation, the commission's contentions to the contrary are unpersuasive. Therefore, the commission's third objection is without merit.
 {¶ 9} Relator asserts two objections. Relator argues in his first objection that the magistrate's decision was unclear as to whether it granted a limited writ of mandamus returning the matter to the commission or a full writ of mandamus vacating the commission's order and directing the commission to grant the motion for vision loss. However, we believe that the magistrate's order is clear. The magistrate issued a writ of mandamus ordering the commission to vacate its order and to enter a new order adjudicating relator's motion for R.C. 4123.57(B) compensation. Nowhere in the order did the magistrate determine whether Dr. Litvak's August 18, 2004 report adequately addressed the deficiencies outlined in the DHO's prior order. The magistrate merely concluded that the SHO could not affirm the DHO's order without first addressing Dr. Litvak's intervening report. Therefore, as the magistrate left the issue of permanency of relator's condition to be decided by the commission upon further review, only a limited writ of mandamus was warranted.
 {¶ 10} Relator argues in his second objection that, to the extent this court finds the magistrate's decision granted only a limited writ of mandamus, the magistrate erred in not granting a full writ of mandamus. However, whether Dr. Litvak's August 18, 2004 report sufficiently establishes the requisite permanency necessary for an award under R.C.4123.57(B) is subject to interpretation. As the magistrate did not decide the issue and ordered the matter be returned to the commission for such a determination, a full writ of mandamus is inappropriate. Therefore, this objection is without merit.
 {¶ 11} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's, Meijer's, and the commission's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and grant relator's request for a limited writ of mandamus.
Objections overruled; limited writ of mandamus granted.
Klatt and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. :
Randy M. Gidley, :
 Relator, :
v. : No. 04AP-1316
Industrial Commission of Ohio : (REGULAR CALENDAR)
and Meijer, Inc., :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on May 12, 2005 Connor Behal, L.L.P., Lori M. DiRenzo, Daniel D. Connor, Gary P.Martin and Kenneth S. Hafenstein, for relator.
Jim Petro, Attorney General, and Lasheyl N. Sowell, for respondent Industrial Commission of Ohio.
Roetzel Andress, and Charles D. Smith, for respondent Meijer, Inc.
IN MANDAMUS
 {¶ 12} In this original action, relator, Randy M. Gidley, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him R.C. 4123.57(B) compensation for the alleged loss of sight of the left eye, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 13} 1. On January 30, 2002, relator sustained an industrial injury while employed with respondent Meijer, Inc. ("Meijer"), a self-insured employer under Ohio's workers' compensation laws. On that date, relator accidentally dropped a bottle of weed killer which broke, splashing the chemical into both eyes. After flushing the eyes at the accident cite, relator presented that same day to an emergency room hospital for evaluation and treatment.
 {¶ 14} 2. The emergency room physician who examined relator on January 30, 2002, wrote his impression as "chemical burn of the cornea." The doctor described the visual acuity of the left eye as "left eye light perception."
 {¶ 15} 3. On February 6, 2002, Meijer initially certified the industrial claim for "Acute Conjunctivitis left and right eye * * * and Acute Iridocyclitis left eye."
 {¶ 16} 4. On January 31, 2002, relator was examined by ophthalmologist Alan D. Letson, M.D. On February 8, 2002, Dr. Letson reported:
* * * The last time I saw Randy was back in 1985. He had presented to me with a nasal retinal detachment associated with a two-clock hour dialysis. This was successfully repaired with scleral buckling and at the last visit in 1985 vision in that left eye was 20/20. He was seen by Alan Rehmar in 1991 and the left eye at that time was still attached with 20/20 vision. That was our last contact with Randy.
Randy states that on January 30, 2002, while at work, he was attempting to lift a box filled with chemicals and the container broke dropping chemicals to the floor. Apparently some of the containers broke and chemical fluid splashed up into his eyes. * * * Although he has no complaint about the vision in his right eye other than some light sensitivity, he complains that immediately after the chemical exposure, his left eye became N[o] L[ight] P[erception]. * * *
* * *
* * * I can find absolutely no evidence of retinal abnormality or injury in either eye, nor is there any evidence of optic nerve abnormality. The ocular media are completely normal and clear bilaterally and, for all intents and purposes, there is no visible evidence of ocular trauma and certainly nothing that would result in NLP vision. I am concerned that this may be a situation of hysterical blindness or malingering. We did go ahead and perform a fluorescein angiogram, as I felt this was probably going to have some medical legal implication somewhere along the line. Color photography and fluorescein angiography of each eye are totally normal without any evidence of macular retinal vascular or optic nerve abnormality in either eye. Ultimately I felt we also needed some other objective evidence of physiologic function so I have requested that an ERG and EOG be performed, as these are fairly objective indicators of retinal physiology. I did raise the issue of hysterical blindness with Randy and indicated that this was often a transient phenomenon. I told him that I found absolutely no indication of any significant ocular trauma that would result in NLP vision and that if indeed this level of visual function were true, then we would have to look to other sources of vision loss. * * *
 {¶ 17} 5. Dr. Letson referred relator for testing to be performed by L.E. Leguire, Ph.D., who is Director of Electrophysiological Testing and Eye Research at Children's Hospital, Columbus, Ohio. On February 27, 2002, relator presented at the lab for electrophysiological testing. On February 28, 2002, Dr. Leguire reported:
* * * The patient denies all vision in OS (NLP). Medical history is significant for trauma and retinal detachment as well as repair in OS when the patient was a teenager. Overall, the results suggest normal retinal and generally normal visual function in OD and OS at this time with some variability noted as described. Overall, given the normal pattern VERs from OS, and given the patient's prior medical history of trauma to OS, the results are consistent with a nonorganic cause of vision loss in OS. I do believe that that patient's complaints of vision loss are real (ie, not malingering), in part due to the lack of a blink response to the high intensity flash stimulation under dark adapted conditions. The patient may have hysterical blindness triggered by the eye injury/accident at his current place of employment. * * *
 {¶ 18} 6. On March 6, 2002, Dr. Letson saw relator for a follow-up. Dr. Letson wrote:
* * * Randy still reports no light perception vision in his left eye. Clinical examination shows the left eye to be structurally intact and normal in appearance. The electrophysiologic testing that examined the neurologic visual apparatus all the way from the retina back to the occipital cortex was also completely normal for both the right and left eyes. Based on clinical examination and neuroelectrophysiologic examination, I can find no evidence of organic deficit and therefore believe this is probably hysterical blindness. Randy had had injury and surgery to correct a detached retina in this very same left eye about 20 years ago, and it is conceivable that the recurrent injury may have triggered a psychological reaction over concern about this left eye in spite of the lack of any significant injury other than some mild superficial conjunctivitis. Hysterical blindness can be a very real phenomena to the affected individual and because of this, I would recommend that Randy seek psychological or psychiatric counseling for this. * * *
 {¶ 19} 7. On November 14, 2002, Dr. Letson wrote to relator:
I got the results of your MRI of the optic nerves, orbits and brain. The MRI of the orbits, optic nerves and optic chiasm as well as the brain was normal. There was no sign of any tumor, aneurysm, or inflammatory disorder that would cause vision loss or headache. * * *
The negative findings of this MRI in regard to your vision loss in the left eye also goes along with the negative findings of the ERG, VER and clinical examinations. All this still would seem to point to some form of hysterical blindness which is typically some form of a conversion reaction. Whether the trauma to your eye at the time of the chemical splash was enough to trigger such a psychological response or not is an assessment probably best made by a psychologist or psychiatrist. Those aspects are beyond my area of expertise and at this point I think it would be appropriate to pursue a psychological evaluation. So far we have not been able to find any objective physical evidence to explain the loss of vision in the left eye.
 {¶ 20} 8. On December 19, 2002, based on Dr. Letson's November 14, 2002 report, relator moved for authorization of a psychological consult. Following an April 18, 2003 hearing, the commission granted relator authorization for a psychological consult.
 {¶ 21} 9. On October 1, 2003, relator underwent an initial psychiatric evaluation and consultation performed by psychiatrist Ronald Litvak, M.D. On October 2, 2003, Dr. Litvak wrote to Meijer:
I have reviewed the various files which were furnished me by physicians including his ophthalmologist, Dr. Letson, in which it was concluded after extensive evaluation there is no physical cause for the persistent loss of vision in the left eye.
Based upon this and my initial evaluation personally of the claimant it is concluded he has a conversion disorder (300.11) with loss of vision in the left eye, and this was caused by the work injury which occurred January 30, 2002 as there seemingly are no other causes and there is a direct chronologic relationship.
Further psychiatric evaluation is necessary in order to try and determine what the psychological mechanism is that is causing the blindness and subsequently what treatment would be indicated.
It is requested that two additional psychiatric evaluation sessions * * * be allowed to complete the evaluation.
 {¶ 22} 10. Based on Dr. Litvak's report, Meijer additionally certified the claim for: "conversion disorder."
 {¶ 23} 11. On January 8, 2004, Dr. Litvak wrote to Meijer:
I have finished doing the evaluation, and it seems very likely several psychological factors are entailed in causing the hysterical blindness. First, he has had trauma to that eye in the past and somehow or another this recent, much less severe physical injury, resulted in a psychological response causing psychological blindness. Second, he is extremely upset about several situations with considerable anger, anxiety, and depression intermixed and has suppressed his feelings so secondarily these emotions have been displayed with the physical symptom, namely the blindness.
My treatment plan is to begin treating him with an anti-anxiety/antidepressant medication which also should help diminish the anger, namely Fluoxetine, with the hope if this is successful it will help and improve the visual symptoms. Also, I will see whether it will be helpful to have him talk more about these psychologically distressful things causing the symptom. If these treatment modalities do not work it would be worth considering hypnosis, but the medication and psychotherapy are more likely to be helpful.
Accordingly, I am requesting approval of six additional 15 minute to 30 minute sessions each 2 to 4 weeks in order to initiate and assess the efficacy of the treatment.
 {¶ 24} 12. On April 28, 2004, Dr. Litvak wrote to relator's counsel:
I have reviewed my files, and will answer the questions posed in your April 13, 2004 letter. * * *
* * * I have concluded to a reasonable degree of medical and psychiatric probability the allowed condition of conversion disorder is responsible for Mr. Gidley's loss of vision. Also, this loss of vision in the left eye is complete, total, and permanent as related to the allowed conversion disorder. These conclusions are arrived at on the basis the physical findings did not indicate any physical illness or injury responsible for the loss of vision, and the loss of vision has been so persistent and non-responsive to treatment modalities such as various medications and psychotherapy it is concluded it is a permanent condition.
 {¶ 25} 13. On May 12, 2004, relator moved for R.C. 4123.57(B) compensation for the alleged loss of vision of the left eye.
 {¶ 26} 14. Following a July 21, 2004 hearing, a district hearing officer ("DHO") issued an order denying relator's motion. The DHO's order states:
The District Hearing Officer finds no medical evidence in file demonstrating there is any physical reason as to why the injured worker cannot see out of his left eye. Dr. Letson notes in his 11/14/2002 report that he had not been able to find any objective physical evidence to explain the loss of vision in the injured worker's left eye. Based on the 04/28/2004 report from Dr. Litvak, the District Hearing Officer finds the injured worker's loss of vision in his left eye is due to the allowed conversion disorder in this claim. The District Hearing Officer notes no other medical evidence in file demonstrating there is anything other than the conversion disorder causing the injured worker's loss of vision in his left eye. It is based on this loss of vision due to the alleged conversion disorder that the injured worker seeks an award for the loss of sight in his left eye.
The injured worker's motion is denied as there is insufficient evidence demonstrating that the injured worker has sustained a permanent loss of vision in his left eye. As noted above, the medical evidence in file supports a finding the injured worker's loss of vision in his left eye is due to the allowed conversion disorder in this claim. Based on this, it follows that any resolution of the conversion disorder might very well result in some resolution of the injured worker's loss of vision in his left eye. In other words, if it is Dr. Litvak's opinion the loss of vision is due to the conversion disorder, then the District Hearing Officer is persuaded that a resolution of the conversion disorder, if only in part, might also result in a resolution of some of the vision loss in the injured worker's left eye. In reviewing the medical evidence in file, the District Hearing Officer notes no evidence stating that the injured worker's conversion disorder is such that it and the resulting vision loss are in fact permanent. In other words, the District Hearing Officer finds insufficient medical evidence stating the injured worker's conversion disorder is at such a point that any manifestations of this disorder, including a loss of vision, would be permanent. In short, the District Hearing Officer finds insufficient evidence explaining that the allowed conversion disorder is at such a level of permanency that the manifestation of this disorder, the loss of sight in the left eye, is also at a level of permanency where the injured worker does in fact have a permanent loss of sight in his left eye. Therefore, based on the above, there is insufficient medical evidence demonstrating the injured worker's loss of vision in his left eye is total and permanent. Therefore, the motion is denied.
 {¶ 27} 15. Relator administratively appealed the DHO's order of July 21, 2004.
 {¶ 28} 16. On August 18, 2004, Dr. Litvak wrote to relator's counsel:
I have reviewed my files in respect to your August 4, 2004 letter, and maintain my prior opinion as expressed in my letter of April 28, 2004, that the conversion disorder is responsible for Mr. Gidley's loss of vision, the vision loss in the left eye is complete, total, and permanent.
It has been more than 2½ years since he was injured, conversion disorders are notoriously difficult to treat generally, and I attempted to treat his robustly with three different appropriate medications along with intensive psychotherapy, and there was no symptomatic response whatsoever. It is not felt that any continued prolonged treatment or other types of treatment modalities such as hypnosis or cognitive behavioral therapy would be any more effective.
Thus, I do not see any indication that any type of continued treatment would result in alleviation of the symptoms of the allowed psychiatric disorder.
 {¶ 29} 17. On September 7, 2004, relator's administrative appeal was heard by a staff hearing officer ("SHO"). Following the hearing, the SHO issued an order stating:
The order of the District Hearing Officer, from the hearing dated 07/21/2004, is affirmed. Therefore, the C-86, filed 05/12/2004, is denied.
The request for a TOTAL LOSS OF VISION OF THE LEFT EYE is denied. The Staff Hearing Officer finds there is no physical objective evidence of a total loss of left eye vision. The Staff Hearing Officer relies on the 03/02/2002 report of Dr. Letson, the 05/09/2002 report of Dr. Letson, the 11/14/2002 examination and report of Dr. Letson; the 02/28/2002 report of Dr. Leguire and the 02/08/2002 report of Dr. Letson.
The Staff Hearing Officer finds the total loss of vision of the left eye is not a physical finding as all physical findings of the left eye were normal based on the reports cited above.
The Staff Hearing Officer finds the total loss of vision of the left eye is a subjective symptom stemming from the allowed conversion disorder per Dr. Letson's 02/08/2002 report and Dr. Litvak's 08/18/2004 report. The Staff Hearing Officer notes that Dr. Letson opined that blindness is often a transient phenomena. The Staff Hearing Officer does not find the loss of vision of the left eye in this claim is a separate vision allowance intended by R.C. 4123.57 as the symptom of loss of vision is not physically documented as all physicians agree that the symptom of left eye loss of vision is [a] residual symptom of the allowed conversion disorder.
(Emphasis sic.)
 {¶ 30} 18. On October 13, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO order of September 7, 2004.
 {¶ 31} 19. On December 8, 2004, relator, Randy M. Gidley, filed this mandamus action.
Conclusions of Law:
 {¶ 32} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 33} Analysis begins with a review of the DHO's order which was administratively affirmed by the SHO.
 {¶ 34} The DHO's order denying the claim for loss of sight of the left eye challenges the sufficiency of Dr. Litvak's April 28, 2004 report where the doctor opined "this loss of vision in the left eye is complete, total, and permanent as related to the allowed conversion disorder."
 {¶ 35} Citing Dr. Litvak's report, but apparently questioning its conclusion that the loss of sight is permanent, the DHO explained that, in his view, "any resolution of the conversion disorder might very well result in some resolution of the * * * loss of vision." The DHO further explained there is "no evidence stating that the * * * conversion disorder is such that it and the resulting vision loss are in fact permanent." (Emphasis added.) The DHO then stated that there is "insufficient evidence explaining that the allowed conversion disorder is at such a level of permanency that the manifestation of this disorder, the loss of sight in the left eye, is also at a level of permanency." (Emphasis added.)
 {¶ 36} Thus, the DHO felt that Dr. Litvak's opinion regarding permanent loss of sight was insufficient because Dr. Litvak did not opine that the conversion disorder itself was permanent. The DHO reasoned that, if the conversion disorder itself is not permanent, the loss of vision may not be permanent either.
 {¶ 37} Unfortunately, conversion disorder is not defined in the medical evidence of record before this court. This magistrate finds that the definition of conversion disorder provided by Taber's Cyclopedic Medical Dictionary (18 Ed. 1997) is helpful to an understanding of this action. Taber's states, at 439:
[C]onversion disorder A mental disorder marked by symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition. Psychological factors are associated with and precede the condition. Symptoms include loss of sense of touch, double vision, blindness, deafness, paralysis, and hallucinations. Individuals with conversion symptoms show "la belle indifference" or relative lack of concern. The symptoms are not intentionally produced or feigned. The diagnosis cannot be established if the condition can be explained by the effects of medication or a neurological or other general medical condition. SYN: conversion hysteria.
 {¶ 38} The commission is exclusively responsible for weighing and interpreting medical reports. State ex rel. Burley v. Coil Packing, Inc.
(1987), 31 Ohio St.3d 18. Where a key question is left unanswered, the commission is entitled to conclude that the medical report's persuasiveness is either diminished or negated. State ex rel. Pavis v.Gen. Motors Corp., B.O.C. Group (1992), 65 Ohio St.3d 30, 33.
 {¶ 39} Here, the DHO apparently felt that Dr. Litvak's report left a key question unanswered. Is the conversion disorder itself permanent, and if not, why would that not detract from the opinion that the loss of sight is permanent? Because this question was left unanswered, the DHO was entitled to conclude that Dr. Litvak's report is "insufficient" to support an award. Pavis.
 {¶ 40} However, on relator's administrative appeal to the SHO, Dr. Litvak endeavored to address the question raised by the DHO regarding the April 28, 2004 report. On August 18, 2004, Dr. Litvak issued another report, as previously noted.
 {¶ 41} In affirming the DHO's order, the SHO fails to explain whether Dr. Litvak's August 18, 2004 report answers the question or concern that was the basis for the DHO's denial of the claim. Because the SHO failed to do this, the DHO's stated basis for denial of the claim cannot stand. Obviously, the DHO did not have Dr. Litvak's August 18, 2004 report, thus rendering incomplete the analysis regarding the "sufficiency" of the evidence as administratively affirmed by the SHO.
 {¶ 42} The SHO did seemingly attempt to interject his view into the DHO's analysis of the permanency question. The SHO noted that "Dr. Letson opined that blindness is often a transient phenomena." However, Dr. Letson's statement in his February 8, 2002 report does not support a finding that the loss of sight is temporary or transient nor does it save the DHO's analysis. Again, Dr. Letson stated in his February 8, 2002 report: "I did raise the issue of hysterical blindness with Randy and indicated that this was often a transient phenomenon."
 {¶ 43} Clearly, Dr. Letson's statement is not time relevant to the permanency issue raised by relator's May 12, 2004 motion filed more than two years after Dr. Letson's statement. Moreover, Dr. Letson was simply indicating to his patient some hopeful information regarding the clinical course of hysterical blindness generally. Dr. Letson's statement was not offered as a medical opinion specific to relator's condition at the time relator moved for R.C. 4123.57(B) compensation. Accordingly, the SHO's suggestion that Dr. Letson's statement supports a finding that the loss of sight lacks permanency must be rejected.
 {¶ 44} The SHO also seems to offer an additional ground for denial of the claim. In this regard, the SHO's order again states:
* * * The Staff Hearing Officer does not find the loss of vision of the left eye in this claim is a separate vision allowance intended by R.C.4123.57 as the symptom of loss of vision is not physically documented as all physicians agree that the symptom of left eye loss of vision is [a] residual symptom of the allowed conversion disorder.
 {¶ 45} While inartfully worded, the above-quoted sentence seems to convey the proposition that the statute, R.C. 4123.57(B), prohibits a scheduled loss award where the loss results from a conversion disorder and thus cannot be "physically documented." That is, the above-quoted sentence from the SHO's order seems to say that, even if it can be shown that the loss of sight in the left eye is permanent, it is not compensable because there is no physical manifestation of the loss. The SHO's order is incorrect.
 {¶ 46} By definition, a conversion disorder produced deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition. By definition, the deficits of a conversion disorder do not produce deficits that can be "physically documented." See Taber's, supra.
 {¶ 47} The industrial claim is undisputedly allowed for a conversion disorder. The SHO's stated ground for denial of the claim is, in effect, a refusal to accept the conversion disorder as a claim allowance. Refusal to accept the claim allowance is an abuse of discretion. State ex rel.Middlesworth v. Regal Ware, Inc. (2001), 93 Ohio St.3d 214, 216.
 {¶ 48} If relator can show that the allowed conversion disorder produces a loss enumerated under R.C. 4123.57(B), he is statutorily entitled to compensation.
 {¶ 49} Nothing in R.C. 4123.57 nor in any case cited by the parties even suggests that a deficit produced by an allowed conversion disorder cannot be compensable under R.C. 4123.57(B).
 {¶ 50} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the September 7, 2004 order of its staff hearing officer, and to enter a new order consistent with this magistrate's decision that adjudicates relator's May 12, 2004 motion for R.C. 4123.57(B) compensation.